# SCHWARTZ HANNUM PC

91 MAIN STREET • ANDOVER, MASSACHUSETTS 01810
TELEPHONE (978) 623-0900 • FACSIMILE (978) 623-0908
www.shpclaw.com

July 24, 2002

By Facsimile and Overnight Delivery

Ms. Maryann Brunton, Investigator
Massachusetts Commission Against Discrimination
436 Dwight Street
Springfield, MA  01103

> Re:    Janice Marcella v. Banknorth Massachusetts
> MCAD Docket Number 02SEM01403
> EEOC Charge Number 16CA201886

Dear Ms. Brunton:

This letter serves as the statement of position of Banknorth N.A. Massachusetts (the "Bank") in response to the above-referenced Charge of age and sex discrimination (the "Charge") filed by Janice Marcella ("Complainant").[1]

Complainant (a fifty-four year old woman) was employed as a Customer Sales Representative II in the Bank's Pittsfield, Massachusetts branch office. Although generally a competent employee, Complainant consistently exhibited several performance problems. On or about November 19, 2001, Complainant applied for the Assistant Branch Manager[2] position at the Pittsfield branch. After the interview process, the Bank promoted a more qualified employee to the position – a forty-two year (42) old woman with more years of experience with the Bank and prior experience as an Assistant Branch Manager.[3]  On January 14, 2002, Complainant resigned her employment with the Bank after learning that she did not receive the Assistant Branch Manager position. In her Charge, Complainant alleges that the Bank discriminated against her with respect to the promotion and also that a male co-worker who performed the same job as Complainant was making $2 more per hour than Complainant.

---

[1] The contents of this statement of position are based upon information that is currently available to the Bank. The Bank reserves the right to amend and/or supplement this statement of position. Any allegation in the Charge not specifically and expressly admitted in this statement of position is hereby denied.

[2] The Bank's internal title for this Assistant Branch Manager position is Customer Sales and Service Manager IV.

[3] The Bank's internal title for this Assistant Branch Manager position is Customer Sales and Service Manager II.

EXHIBIT A

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -2-                    July 24, 2002

The Bank emphatically denies that it discriminated against Complainant on the basis of age or sex while she was employed by the Bank. In fact, Complainant cannot state a *prima facie* case of age or sex discrimination because Complainant was less qualified for the Assistant Branch Manager position and the candidate selected for the position was also a member of Complainant's protected classes (a woman and more than forty (40) years old), and two of the decision-makers were women who were more than forty (40) years old, plus the male decision-maker was also over forty (40) years old.

As referenced above, and as is more fully explained below, Complainant has entirely failed to meet the legal burden of proof necessary to prevail on her Charge. The facts relevant to the Charge demonstrate indisputably that the Bank did not discriminate against Complainant because of her age or sex. Rather, the Bank clearly had legitimate, non-discriminatory reasons for selecting another employee for the Assistant Branch Manager position.

## FACTS

### I.  Banknorth Massachusetts

Banknorth N.A. Massachusetts (the "Bank") is a community bank, providing retail and commercial products and services for its customers.

The Bank's Pittsfield, Massachusetts branch office is one of the larger branch offices in the Berkshires region. The Branch has ten (10) employees, including six (6) tellers, two (2) customer sales representatives, an Assistant Branch Manager and a Branch Manager.

### II.  The Bank's Relevant Personnel Policies[4]

#### A.  Equal Employment Opportunity Policy

The Bank is committed to equal employment opportunity for all persons, as stated unequivocally in its employment policies. "The policy of [the Bank] is to provide equal employment opportunities to all applicants and employees in all aspects of employment without regard to race, color, religion, sex, age, national origin, ancestry, creed, citizenship, alienage, marital status, sexual orientation, physical or mental disability, veteran status, or any other characteristic protected under federal, state or local law, and to affirmatively seek to advance the principles of equal employment opportunity." (See Equal Opportunity Policy, attached at Tab 2.)

---

[4]Complainant acknowledged receipt of the Bank's Employee Handbook on August 22, 2000. (See Acknowledgment of the Handbook, attached at Tab 1.)

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                         -3-                         July 24, 2002

**B.       Harassment and Discrimination-Free Work Environment Policy**

The Bank's Harassment and Discrimination-Free Work Environment Policy provides that "[The Bank] is committed to a work environment in which all individuals are treated with respect and dignity.  Each individual has the right to work in a professional atmosphere that promotes equal employment and advancement opportunities and prohibits unlawful discriminatory practices."  (See Harassment and Discrimination-Free Workplace Policy, attached at Tab 3.)

An employee who believes that he or she has been subjected to discrimination is encouraged to promptly file a complaint with a department manager or Human Resources Representative.  (Tab 3.)  If the Bank's investigation reveals that a violation of this policy occurred, the Bank will act promptly to eliminate the offending conduct.  (Tab 3.)

**C.       Opportunities for Advancement and Job Posting Policy**

The Bank's Opportunities for Advancement and Job Posting Policy provides that "[a]ll employees will be given equal opportunity to advance to higher level positions. . . . How fast you move will depend upon your performance and attitude and the job openings available."  (See Opportunities for Advancement and Job Posting Policy, attached at Tab 4.)  The policy further provides that, "[I]n selecting employees for promotions and/or different positions, management will consider factors that include the following:

1.       Ability to meet established job standards, as determined by the employee's education and past experience.

2.       Seniority, when two or more employees applying for the same position are otherwise equally qualified.

3.       Attendance and work records.

4.       Performance appraisals.

5.       References from current and/or former Company supervisors."

(Tab 4.)

In addition, pursuant to the Policy, "employees may apply for one internal position at a time."  (Tab 4.)

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -4-                    July 24, 2002

### D.    Job Evaluation Policy

The Bank's Job Evaluation Policy provides that: "[e]very job in the Company has been carefully evaluated on the basis of experience and education required. The degree of responsibility, ability to deal with people, and special aptitudes required also serve as a basis for job and salary evaluation. These special requirements and skills determine the grade level assigned to each job." (See Job Evaluation Policy, attached at Tab 5.)

The Policy further provides that, "[w]here an employee starts in the job's salary range depends on experience, relevant education and market conditions." (Tab 5.)

Finally, an individual's base pay at the Bank may also be based upon the value of the job to the Bank. (Tab 5.)

### E.    Mystery Shop Scores

Pursuant to the Bank's Retail Incentive Plans, customer sales representatives ("CSRs") are often assessed by "shoppers." "Shoppers" are individuals hired by an external agency who pretend to be Bank customers in order to assess a CSR's performance. These shoppers assign a mystery shop score to the CSR based on several factors, including reception (how the shopper is greeted by the employee), professionalism, and closing (how the employee ends the meeting).

### III.    Complainant's Employment

Complainant began working as a Head Teller in the Pittsfield, Massachusetts branch of BankBoston, which was later acquired by Banknorth Group, Inc., on January 14, 1987. During the next fifteen (15) years, Complainant performed a variety of jobs. While employed as a CSR, Complainant exhibited several performance problems.

In January of 2002, at the time of her resignation from the Bank, Complainant was employed as a Customer Sales Representative II in the Bank's Pittsfield branch office. In this position, Complainant was responsible for interacting with customers to open new accounts, process loan applications and assess their needs, as well as implementing sales strategies for the branch, and assisting with overall operations compliance.

### A.    Complainant's Performance and Developmental Issues

Although Complainant was generally a competent employee, the Bank had several concerns in regard to her job performance and development, including Complainant's: (1) substandard shop scores; (2) lack of management skills; and (3) refusal to learn the teller function.

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                          -5-                          July 24, 2002

1.     **Substandard Shop Scores**

Pursuant to the Bank's Retail Incentive Plans, Complainant was periodically evaluated by mystery shoppers. Complainant's shop scores were often rated as substandard. For example, on or about June 29, 2000, Complainant was "shopped' in regard to a checking account. The shopper gave Complainant a total score of eighty-five (85) points, five (5) points less than the Bank standard of ninety (90) points. (See Sales, Service & Product Evaluation, attached at Tab 6.) Specifically, the shopper noted that: "[Complainant] called me to her desk, but remained seated, she did not ask my name or give me hers." (Tab 6.) As a result, the shopper rated Complainant as "0" in the following categories: (1) Employee stood to introduce him/herself; (2) Employee shook your hand; and (3) Employee addressed you by name. (Tab 6.)

Approximately two months later, on or about August 16, 2000, Complainant was "shopped' in regard to CDs. The shopper gave Complainant a total score of seventy-nine (79) points, eleven (11) points less than the Bank standard of ninety (90) points. (See Sales, Service & Product Evaluation, attached at Tab 7.) Specifically, the shopper noted that: "As I waited for a CSR, both were on phone calls. When done [Complainant], sitting at her desk, called out to me from across the lobby area, 'can I help you.' I got up, walked to her desk area and stated I had a question about a joint CD account. [Complainant] talked about some CD terms and interest rates. I asked if there was information I could take with me. She excused herself to get a brochure and wrote some notes on it. She answered a telephone call while at the desk and dealt with another branch. Then I was thanked for coming in. No business card was offered." (Tab 7.) As a result, the shopper gave Complainant 0 points in the following categories: (1) Offered a friendly verbal greeting; Greeted you with a smile; (2) Employee stood to introduce him/herself; (3) Employee shook your hand; and (4) Employee addressed you by name; (5) Were you offered a business card; and (6) Did the employee stand at closing. (Tab 7.)

Approximately two (2) months later, on or about October 25, 2000, Complainant was again "shopped' in regard to CDs. The shopper gave Complainant a total score of seventy-five (75) points, fifteen (15) points less than the Bank standard of ninety (90) points. (See Sales, Service & Product Evaluation, attached at Tab 8.) Specifically, the shopper noted that: "[Complainant] did not stand, introduce herself, ask my name or offer a hand shake. . . . She did not offer any brochures, but wrote the CD rates on the back of her business card, saying I should call her if I needed further information and come into the bank when I was ready." (Tab 8.) As a result, the shopper awarded Complainant 0 points in the following categories: (1) Employee stood to introduce him/herself; (2) Employee shook your hand; (3) Employee addressed you by name; (4) Cross-sell of other products; (5) Were you offered additional information; and (6) Did the employee stand at closing. (Tab 8.)

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -6-                    July 24, 2002

Moreover, in Complainant's Non-Exempt Performance Plan and Appraisal, dated March 12, 2001, Complainant was cautioned about "inconsistency in her shopper surveys, ranging just below bank standards." (<u>See</u> Non-Exempt Performance Plan and Appraisal, attached at <u>Tab 9</u>.)

On or about October 1, 2001, Complainant was again "shopped" in regard to checking accounts. The shopper gave Complainant a total score of seventy-nine (79) points, eleven (11) points less than the Bank standard of ninety (90) points. (<u>See</u> Sales, Service & Product Evaluation, attached at <u>Tab 10</u>.) Specifically, the shopper noted that: "When [Complainant] finished her call she began to work at her desk and did not appear to notice that I was waiting. I walked to her area and asked if she could help me with opening an account. She was pleasant and made eye contact and smiled although she did not shake my hand, stand, offer me a chair or introduce herself. . . . She did not offer her card although after I asked for her card she told me I should call her if I had any further questions." (<u>Tab 10</u>.) As a result, the shopper gave Complainant 0 points in the following categories: (1) Acknowledged in a timely manner; (2) Employee stood to introduce him/herself; (3) Employee shook your hand; (4) Employee addressed you by name; (5) Offered you a seat; and (6) Were you offered a business card. (<u>Tab 10</u>.)

When discussing these substandard shop scores, Complainant failed to accept responsibility for them, and instead blamed her performance on the branch tellers, for sending customers to wait at Complainant's desk, rather than inviting them to wait in the waiting area.

### 2.    <u>Lack of Management Skills</u>

Complainant was regularly counseled by her managers to improve her management skills in order to be eligible for an Assistant Branch Manager position in the future. For example, in her Employee Performance Review, dated February 25, 1999, Complainant was advised to "attend management development programs to increase management skills" and to "work with the branch manager to increase supervisory and team leadership skills." (<u>See</u> Employee Performance Review, attached at <u>Tab 11</u>.) In response, Complainant stated that: "I would like to participate in all the courses." (<u>Tab 11</u>.)

Again, in Complainant's Employee Performance Review dated February 29, 2000, Complainant was encouraged to "work with the Branch Manager to increase supervisory and leadership skills" and to "attend Management Development Programs." (<u>See</u> Employee Performance Review, attached at <u>Tab 12</u>.)

Despite this encouragement, Complainant never attended any management development programs, or demonstrated any initiative to improve her leadership skills.

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                      -7-                      July 24, 2002

### 3.    Complainant's Refusal to Learn the Teller Function

In the Spring of 2001, Complainant was informed by her Branch Manager that she would be required to cross-train on the teller line, in order to assist tellers during busy times or to substitute for an absent teller. In response, Complainant stated that she would quit if she were asked to cross-train or staff the teller line, because she felt that her customers would lose confidence in her. As a result of this refusal, Complainant's managers inferred that Complainant viewed the teller function as a subordinate role, and that Complainant did not value all of the Branch employees and functions.

## IV.    The Assistant Branch Manager Position

Pursuant to the Bank's Opportunities for Advancement and Job Postings Policy (Tab 4), on or about November 16, 2001, the Bank posted a job opening for an Assistant Branch Manager at its Pittsfield branch. (See Job Posting, attached at Tab 13.) Pursuant to this posting, the Assistant Branch Manager would be responsible for:

- Acting as a personal banker to promote growth and ensure quality services.

- Actively developing retail business including deposit growth, residential mortgage, consumer lending and investment sales both individual and as one of the leaders on the branch sales effort.

- The daily operation of the banking center.

(Tab 13.)

The minimum requirements for the Assistant Branch Manager position included a college degree or equivalent experience; three (3) years of banking or retail sales experience and two (2) years of supervisory experience and prior CSR experience; excellent communication skills; sales ability; previous consumer lending experience preferred; and knowledge of Microsoft Word. (Tab 13.)

### A.    Candidates for the Assistant Branch Manager Position

On or about November 19, 2001, Complainant applied for the Assistant Branch Manager position. (See Request for Transfer, attached at Tab 14.) In her Request for Transfer, Complainant stated that, "[m]y career goal at this time is to become Assistant Manager at the West Street Office and help improve the morale and exceed our sales goal." (Tab 14.) In the resume attached to her Request for Transfer, Complainant stated that in her role as a Personal

Ms. Maryann Brunton                           -8-                        July 24, 2002

Banker,[5] she "supervised large branch in absence of manager." (<u>Tab 14</u>.)

Shortly after Complainant submitted her Request for Transfer, David Clark ("Mr. Clark"), the Branch Manager[6] for the Pittsfield branch office, informed Complainant that she was the only internal applicant for the position.

However, on or about November 28, 2001, Robin Sabato, another internal candidate, applied for the Assistant Branch Manager position. (<u>See</u> Request for Transfer, attached at <u>Tab 15</u>.) On her Request for Transfer, Ms. Sabato stated that: "[m]y short term goals are to continue to oversee the branch operations and sales efforts of a larger office." (<u>Tab 16</u>.) Ms. Sabato further stated that: "during the past six months I have attended the following training classes: Foundations of Leadership, Coaching Skills, HR Nuts & Bolts, Interviewing Skills, and Small Business Foundations." (<u>Tab 15</u>.)

**B.      The Interview Process[7]**

In or about early December, 2001, Gail Hamel ("Ms. Hamel"), the Bank's Vice President, Human Resources Representative for the Berkshires Region, conducted telephone interviews with every internal and external applicant who had applied for the Assistant Branch Manager position in order to determine whether the applicant met the minimum qualifications for the position.

Prior to Complainant's interview with Ms. Hamel, Mr. Clark coached Complainant about the interview process, and urged her to be prepared to answer questions about how she had demonstrated her leadership and management skills.

After conducting these telephone interviews, Ms. Hamel recommended that several applicants, including Complainant and Ms. Sabato, continue to the next step in the interviewing process, by interviewing with Mr. Clark.

Ms. Hamel recommended that Complainant continue the interview process because Complainant's strengths included years of banking experience and "knowledge of customers and product." (<u>See</u> Candidate Evaluation Form, attached at <u>Tab 16</u>.) Ms. Hamel, however, expressed reservations about Complainant's demonstrated "lack of leadership" and noted that Complainant

---

[5]Customer Sales Representative IIs were previously called Personal Bankers.

[6] The Bank's internal title for this position is Business Development and Sales Manager.

[7]The interview process was conducted over a two month period, because of the number of candidates who applied for the position and the winter holidays that occurred during this period.

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -9-                    July 24, 2002

had "been told several times by manager(s) and RVP[8] what she needs to do to get to [an assistant branch manager] level and she has not taken the initiative to do any of them." (Tab 16.)

Ms. Hamel recommended that Ms. Sabato continue the interview process with Mr. Clark, and further recommended that the Bank extend an offer to Ms. Sabato. (See Candidate Evaluation Form, attached at Tab 17.) Ms. Hamel noted that Ms. Sabato "has developed sales initiatives for staff; experienced in CSSM position; solid operations experience; knowledge of West Street customers and branch; proven ability to handle difficult employee situations. (Tab 17.) Ms. Hamel further noted that Ms. Sabato provided "very specific examples current to [the Assistant Branch Manager] position" and that she had "experience with sales success and leading teller and platform staff in sales meeting." (Tab 17.)

Thereafter, Ms. Hamel created a chart that compared the internal candidates for the Assistant Branch Manager position. (See Internal Candidate Evaluation, attached at Tab 18.) Ms. Sabato clearly outscored Complainant in product knowledge, sales, customer service, policies and loans. (Tab 18.)

After interviewing Complainant in or about late December 2001 or early January 2002, Mr. Clark recommended that Complainant continue the interview process with Dona Beck, the Bank's Regional Vice President. (See Candidate Evaluation Form, attached at Tab 19.) Mr. Clark noted that Complainant's strengths included: "Strong product knowledge. Dependable. Length of service with branch – knows most customers, has loyal following." (Tab 19.) Mr. Clark expressed concerns, however, about Complainant's ability to perform the Assistant Branch Manager position, including Complainant's erratic shop scores, refusal to take initiative to learn the teller function, and failure to provide concrete examples of her leadership experience.

In or about December 2001 or January 2002, Mr. Clark interviewed Ms. Sabato for the Assistant Branch Manager position. After interviewing Ms. Sabato, Mr. Clark recommended that Ms. Sabato also continue the interview process with Ms. Beck. (See Candidate Evaluation Form, attached at Tab 20.) Mr. Clark noted that Ms. Sabato's strengths included:

---

[8]Ms. Hamel was referring to Dona Beck, the Bank's Regional Vice President.

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -10-                    July 24, 2002

- Very strong product knowledge skills.

- Worked in several branches with good results in each branch.

- Team player.

- Generated and implemented several sales initiatives with good success.

(Tab 20.)

     Mr. Clark also noted that: "No apparent weaknesses were noted during this interview." (Tab 20.) At the time of her interview, Ms. Sabato had been employed as an Assistant Branch Manager in the Bank's Great Barrington office for eight (8) months. As a result, Ms. Sabato had eight (8) months of experience in a similar position with similar responsibilities; and in this regard had "handled difficult situations in a positive and effective manner." (Tab 20.) During the interview, Ms. Sabato provided concrete examples of her leadership experience and initiative.

     Thereafter, on or about January 10, 2002, Complainant interviewed with Ms. Beck. After interviewing Complainant, Ms. Beck indicated that Complainant was "not currently prepared for the responsibilities of the position" and that she should not be promoted. (See Candidate Evaluation Form, attached at Tab 21.) Ms. Beck further noted Complainant's weaknesses, including:

- Although Complainant performs well as a CSR she does not take initiative to guide or mentor other team players.

- Complainant has limited supervisory experience.

- [Complainant] stated that she felt that she did not have the respect of the tellers and that she acknowledged that she did not take any action to improve the situation.

- Complainant did not seem to understand the need for platform support of the teller line and recently had threatened to quit if she had to swing to perform teller duties.

(Tab 21.)

     Ms. Beck subsequently e-mailed Ms. Hamel, and noted that "I just met with Janice and I was very straightforward in soliciting any leadership activities she may have taken (not just three months but the last year!) Clearly she could not site a one." (See E-mail from Dona Beck to Gail Hamel, attached at Tab 22.)

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                            -11-                            July 24, 2002

That same day, Ms. Beck interviewed Ms. Sabato, and recommended that the Bank extend an offer to her.  (See Candidate Evaluation Form, attached at Tab 23.)  Ms. Beck noted Ms. Sabato's strengths, including:

- [Ms. Sabato] has an excellent grasp of the sales culture of the company and has taken a leadership role in several offices.

- As the CSSM in the Great Barrington office, [Ms. Sabato] has led sales meetings for the platform and teller staff.
- [Ms. Sabato] has excellent supervisory skills, having attended several supervisory training classes and having overseen branch operations in several offices.

- While previously in Coltsville, [Ms. Sabato] was faced with a serious facility problem which she managed extremely well, demonstrating sound judgment while interacting with several areas inside and outside the bank.

(Tab 23.)

Moreover, Ms. Beck spoke to Ms. Sabato's then current manager, who highly recommended Ms. Sabato for the Assistant Branch Manager position.  During this conversation, Ms. Beck also learned that Ms. Sabato had excellent shop scores.

As a result, on or about January 11, 2002, Mr. Clark, Ms. Hamel and Ms. Beck made the decision to extend an offer to Ms. Sabato.  Ms. Sabato accepted the offer that same day.

**V.    Complainant's Resignation**

Thereafter, on or about January 12, 2002, Mr. Clark informed Complainant that the Bank had offered the Assistant Branch Manager position to Ms. Sabato.  In response, Complainant stated "this is it" and "I'm out of here," or words to that effect.  After giving Complainant some time to digest the news and to calm down, Mr. Clark assured Complainant that she was a valuable member of the team and that he did not want Complainant to resign from the Bank.  Mr. Clark urged Complainant to think about her decision over the weekend.

On or about Tuesday, January 16, 2002, Complainant resigned her employment with the Bank.  (See Resignation Letter, attached at Tab 24.)  In her Resignation Letter, Complainant claimed that, "I was promised the Assistant Manager's position for three years, meanwhile doing the job.  It has been decided to bring another employee into the Office to fill that position.  I feel I have been forced into terminating my job, I no longer can work in this demeaning and humilating [sic] environment which has made me physically ill." (Tab 24.)

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                              -12-                              July 24, 2002

Pursuant to her letter of resignation, Complainant provided two (2) weeks' notice and worked at the Bank until January 25, 2002.

## VI.    The Float Assistant Manager Position

On or about January 15, 2002, pursuant to its Opportunities for Advancement and Job Postings Policy (Tab 4), the Bank posted a Float Assistant Manager position in the Berkshires Region. (See Job Posting, attached at Tab 25.) Pursuant to the job posting, the Float Assistant Manager would be responsible for:

- Acting as a Personal Banker to promote growth and ensure quality service;

- Actively developing retail business including deposit growth, residential mortgage, consumer lending and investment sales both individual and as one of the leaders on the branch sales effort;

- Responsible for the daily operation of the banking center; and

- Providing coverage for all branches as needed in the Berkshire region.

(Tab 26.)

Despite being eligible to do so and despite being an active employee of the Bank at the time the position was posted, Complainant never applied for this position. Although Complainant asserts in her Charge that she "was ineligible to apply according to the employee handbook because current employees cannot apply for more than one position simultaneously" (Charge, ¶3), Complainant was, in fact, eligible to apply for the Float Assistant Manager position because she had already been informed that Ms. Sabato had accepted the Assistant Branch Manager position.

The Bank subsequently offered the Float Assistant Manager position to an external candidate, who had previously applied for the Assistant Branch Manager position in the Pittsfield branch.

## VII.    Gary Houghtailing

In her Charge, Complainant claims that a male co-worker who "performed the same job" as "her earned $2 per hour more than" she. (Charge, ¶ 7) The co-worker that Complainant refers to, Gary Houghtailing ("Mr. Houghtailing"), was initially hired as a Customer Sales Representative II ("CSR") for one of the Bank's supermarket branches, with the understanding that he would have supervisory responsibilities in the branch manager's absence. This was necessary because the supermarket branches were open seven (7) days per week, for

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -13-                    July 24, 2002

approximately sixty (60) to sixty-six (66) hours per week. As a result, the CSRs in the supermarket branches often had more managerial responsibility because the manager was not available for sixty-six (66) hours each week. As a result, Mr. Houghtailing's hourly rate was higher than Complainant's hourly rate because it reflected his managerial responsibilities at the supermarket branch, as well as his prior experience as a retail manager. (See Houghtailing Resume, attached at Tab 26.)

When Mr. Houghtailing learned that he would lose his job when the Bank permanently closed its supermarket branches in May and June of 2001, he transferred to the Bank's Pittsfield branch. Although Mr. Houghtailing no longer had supervisory responsibilities at the Pittsfield branch, the Bank, pursuant to Bank policy for lateral transfers and because Mr. Houghtailing's hourly wage was within the approved salary range for his position, did not decrease his pay.

## LEGAL ANALYSIS

Although the facts necessary to establish a *prima facie* case of unlawful employment discrimination vary depending on the circumstances of each case, in general, in order to establish a claim of discrimination, a complainant must prove that: (1) she is a member of a class protected by M.G.L. c. 151B; (2) she has performed her job at an acceptable level; and (3) she was discharged or otherwise subjected to an adverse employment decision. See Birks v. Holiday Inn, 91-SEM-0519 (Guastaferri, February 12, 1998). See also Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass 437, 443 (1995).

If the complainant is able to establish a *prima facie* case, the respondent can rebut the *prima facie* showing by providing legitimate, non-discriminatory reasons for the alleged adverse employment action. See Abramiam v. President & Fellows of Harvard College, et al., 432 Mass. 107, 116-17 (2000); Pires v. Falmouth Police Dept., 94-NEM-0111 (Grooms, January 30, 2001).

Once the respondent articulates legitimate, non-discriminatory reasons for the adverse employment action, the complainant must prove by a preponderance of credible evidence that the respondent's legitimate, non-discriminatory reasons are pretextual. See Dodson v. Sandpoint, L.L.C., 95-BEM-3275 (Kaplan, April 29, 1998); Blare, 419 Mass at 443.

If the respondent's reasons are not discriminatory, and if the complainant does not prove that it is a pretext, the complainant cannot prevail. Thus, the burden is on the complainant to demonstrate that: (1) the reasons articulated by the respondent were not the real reason for the employment action; and (2) the reasons have no support in evidence or were merely *post hoc* rationalizations of the discriminatory act. See Crossman & Havener v. S. Bent Brothers, Inc., 82-WEM-0093, 82-WEM-0096 (Guastaferri, November 20, 1991). It is not enough for a complainant to show that the respondent's articulated reason constituted poor business management or was careless; the law prohibits only *discriminatory* decisions. Id. (emphasis added). In satisfying this burden, a complainant may not engage in sheer speculation. Although

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -14-                    July 24, 2002

she need not present direct evidence of discrimination, she may ask the fact-finder to make only those inferences that are reasonably supported in the record. See Parker v. Federal National Mortgage Association, 741 F.2d 975, 980 (7th Cir. 1984).

## I.   Complainant Has Failed to Establish a *Prima Facie* Case of Age or Sex Discrimination

In order to state a *prima facie* case of age or sex discrimination under a disparate treatment theory in a failure to promote case, a complainant must prove that: (1) she is a member of a protected class; (2) she applied for an open position; (3) she was not selected; and (4) her employer hired an individual not in her protected class(es) with qualifications similar to her. See Marchand v. Westport School Committee, 93-BEM-0215 (Schwarz, July 25, 2000); Rattigan v. Copley Plaza Hotel Ltd. Partnership, 94-BEM-0085 (Kaplan, May 6, 1999). In this case, Complainant has failed to satisfy the fourth prong of the *prima facie* case because the Bank hired a more qualified female candidate over the age of forty (40) for the Assistant Branch Manager position.

### A.   Complainant Was Not the Most Qualified Candidate for the Position

Complainant has failed to offer any evidence that the Bank selected a person for the Assistant Branch Manager position who had qualifications similar to her and was not in her protected classes. Thus, she cannot meet the burden of satisfying the *prima facie* case.

First, Ms. Sabato, the individual selected for the Assistant Branch Manager position, is a forty-two (42) year old female. Thus, it is clear that Ms. Sabato and Complainant are in the same protected classes – female and forty (40) years of age or older.

Second, Ms. Beck, Mr. Clark, and Ms. Hamel collectively made the decision to offer the position of Assistant Branch Manager to Ms. Sabato because of Ms. Sabato's length of experience with the Bank, her proven supervisory experience and skills, and her superior shop scores. Neither Complainant's age nor sex played any part in the decision.

Specifically, Ms. Beck, Mr. Clark and Ms. Hamel determined that Ms. Sabato, not Complainant, was the most qualified applicant to be the Assistant Branch Manager. Ms. Sabato was the most qualified person for the position because: (1) she had eight (8) months of similar and directly relevant experience as an Assistant Branch Manager in the Bank's Great Barrington office; (2) she had more years of experience with the Bank; (3) during her interviews, she provided concrete examples of how she had handled supervisory issues in her position; (4) she had a proven ability to handle difficult employee situations; (5) she had successfully led the teller and platform staff; (6) she had excellent shop scores; (7) she showed initiative in taking several

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                     -15-                     July 24, 2002

management training courses; and (8) she was highly recommended by her manager. (See Tabs 17, 20 and 23.)

Complainant was not the most qualified person for the position because she: (1) failed to adequately relate her experience to the requirements of the position; (2) failed to provide concrete examples of her supervisory skills during her interviews despite being coached to do so; (3) showed no inclination to take management training courses, despite being encouraged to do so; (4) consistently had substandard shop scores; (5) refused to learn the teller function; and (6) showed no initiative to guide or mentor other employees. (See Tabs 16, 19 and 21.)

Thus, Complainant's age and sex played absolutely no role in the Bank's promotion decision. Rather, the Bank's decision was based on legitimate, non-discriminatory reasons – selecting the most qualified candidate for the position.

## II.     The Bank Has Articulated Legitimate, Non-Discriminatory Reasons For Its Decision Not to Promote Complainant

Regardless of whether Complainant can establish a *prima facie* case of age or sex discrimination, the Bank has clearly articulated legitimate, non-discriminatory reasons for offering the Assistant Branch Manager position to Ms. Sabato. See Abramiam, 432 Mass. at 116-17; DiBiase v. MBTA, 93-BEM-1244 (Schwarz, August 2, 2000); Pires, 94-NEM-0111. The Bank has satisfied its burden of articulating a legitimate, non-discriminatory reason for offering the Assistant Branch Manager position to Ms. Sabato, because simply put, Ms. Sabato was clearly a more qualified candidate because of her: (1) proven supervisory experience; (2) superior shop skills; (3) demonstrated initiative in taking management training courses; (4) supervisor's recommendation; and (5) length of experience.

Moreover, the role of the Massachusetts Commission Against Discrimination ("MCAD") "is to assess the veracity of respondent's stated reasons. It is not to act as a 'super hiring committee' in reviewing the hiring decision, but to look at the process to determine whether it was tainted by age [or sex] discrimination." See Marchand, 93-BEM-0215.

Clearly, the Bank's process was not tainted by age or sex discrimination because the Bank selected a female over the age of forty (40) for the position – an individual in both of Complainant's protected classes.

## III.    Complainant Cannot Prove That the Bank's Legitimate, Non-Discriminatory Reasons Are Pretextual

Finally, Complainant's discrimination claims must fail because she cannot prove that the Bank's legitimate, non-discriminatory reasons are pretextual. See Blare, 419 Mass. at 441-42; DiBiase, 93-BEM-1244. Complainant is unable to offer any evidence that the Bank's decision

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -16-                    July 24, 2002

was in any way related to her age or sex. As already explained, the Bank hired the most qualified candidate – Ms. Sabato – for the Assistant Branch Manager position.

While Complainant claims that the Bank failed to promote her because of her age or sex, she fails to offer any facts in support of her claim. Complainant attempts to base her discrimination claim on Mr. Clark's alleged "age and sex discriminatory comments in the past, including mentioning that he was 'tired of all the bitching' from the females and saying that Complainant had received 'quite a compliment' when a customer described [her] as being in (her) 40s." (See Charge, ¶ 6.) These alleged comments, however, had nothing to do with Complainant's failure to be promoted. Clearly, Mr. Clark's alleged comments do not "evidence [an] intent to rid the company of employees in the protected class" nor did they have "any causal connection" to the Bank's decision not to promote Complainant. See Rattigan, 94-BEM-0085. In fact, the Bank offered the position to a female employee who is over forty (40) and thus in both of Complainant's protected classes.

Moreover, Ms. Hamel and Ms. Beck were key decisionmakers with respect to promoting Ms. Sabato to be Assistant Branch Manager. It is well established that "it is extremely difficult for a plaintiff to establish discrimination where the allegedly discriminatory decision-makers are within the same protected class as the plaintiff." Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1153 (N.D. Ga. 1997); Landmark Painting and Decorating, Inc. v. Sears, Roebuck and Co., 1995 WL 608578, *4 (N.D. Ill. 1995) ("[w]here the decision maker is in the same protected group as Plaintiff, there can be no compelling inference of discrimination"); Harris v. Delchamps, Inc., 5 F. Supp. 2d 1316, 1332 (M.D. Ala. 1998) (fact that decision-maker and plaintiff are members of same protected class "militates, absent any evidence to the contrary, against an inference of discriminatory animus"); Dungee v. Northeast Foods, Inc., 940 F. Supp. 682, 688 n. 3 (D.N.J. 1996) ("[t]he fact that the final decision maker and both interviewers are members of the plaintiff's protected class (women) weakens any possible inference of discrimination"). Thus, there can be no inference of sex discrimination.

Finally, at the time of the decision, Ms. Beck was fifty-six (56) years of age (older than Complainant), while Ms. Hamel and Mr. Clark were forty-eight (48) and forty-four (44) years of age, respectively. Because the decisionmakers were all over forty (40) years of age, and thus all in Complainant's protected class, Complainant's claim of age discrimination is entirely implausible and unsupported.[9]

---

[9]Complainant attempts to buttress her claim by alleging that Mr. Clark's personal relationships are somehow relevant to her claims of discrimination. Specifically, Complainant alleges that Mr. Clark "is known to have a history of affairs with women he supervised in the office." He is now living with one female co-worker. (See Charge, ¶ 6.) Complainant's allegations, even if true, are completely irrelevant to the Bank's decision to select Ms. Sabato for the Assistant Branch Manager position, rather than Complainant.

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                    -17-                    July 24, 2002

Thus, it is clear that Complainant is unable to raise even an inference, much less prove, that the Bank's legitimate, non-discriminatory reasons for not selecting her were pretextual. Clearly, she was not discriminated against because of her age or sex.

## IV.    Unequal Pay Allegations

In order to establish a *prima facie* case of unequal pay, a Complainant must prove that (1) equal work was performed for unequal compensation and (2) the persons to whom complainant's performance is compared are not members of the same protected class to which complainant belongs. Yeskevicz v. New Technology Precision, Inc., 95-BEM-0923 (Mitnick, March 11, 2001); Eggert v. Cabot Corporation, 94-BEM-1568 (Walker, July 19, 1999).

In order to make an appropriate pay comparison, the complainant must compare herself to similarly situated individuals who perform similar tasks in similar contexts. See Hartman v. MBTA, 96-BEM-1075 (Sherman, August 11, 2000). Although the work being compared need not be identical, it must be substantially equal. See Eggert, 94-BEM-1568. A determination of whether or not "substantial equality" exists focuses upon whether or not the jobs at issue entail the same "primary functions" and "substantially equal skills, effort and responsibility." See Eggert, 94-BEM-1568. In determining if jobs are substantially equal, the focus is on the actual job performance and content – not the job title classifications or descriptions. See Backnick v. Sandwich School Committee, 83-NEM-0019 (Martell, October 23, 1991).

In her Charge, Complainant claims that Mr. Houghtailing, a male co-worker who "performed the same job" as "her earned $2 per hour more than" she. (Charge, ¶ 7.)    As discussed in more detail above, Mr. Houghtailing was initially hired as a Customer Sales Representative II for one of the Bank's supermarket branches, with the understanding that he would have supervisory responsibilities in the branch manager's absence. As a result, Mr. Houghtailing was hired at a higher hourly rate to reflect his managerial responsibilities at the supermarket branch and his prior experience as a retail manager. (Tab 27.)

When Mr. Houghtailing learned that he would lose his job when the Bank permanently closed its supermarket branches in May and June of 2001, he transferred to the Bank's Pittsfield branch, where he worked with Complainant. Although Mr. Houghtailing no longer had supervisory responsibilities at the Pittsfield branch, the Bank, pursuant to Bank policy for lateral transfers and because Mr. Houghtailing's hourly wage was within the approved salary range for his position, did not decrease his pay.

It is clear that at the time Mr. Houghtailing was hired by the Bank and paid a higher hourly rate than Complainant, he had greater responsibility than Complainant and was required to exercise greater skill in the performance of his job. See Eggert, 94-BEM-1568. Moreover, Mr. Houghtailing had many years of managerial experience prior to accepting a position with the Bank. Id.

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                              -18-                              July 24, 2002

Although Complainant and Mr. Houghtailing were performing the same job at the time of Complainant's resignation, Mr. Houghtailing did not perform similar tasks in a similar context at the time he was hired. See Hartman, 96-BEM-1075. In fact, Mr. Houghtailing was hired with the understanding that he would have substantial managerial responsibility in his manager's absence. As a result of these managerial duties and Mr. Houghtailing's previous experience as a retail manager, Mr. Houghtailing was paid a higher hourly rate than Complainant.

For these reasons, Complainant has failed to establish that she and Mr. Houghtailing had "substantially equal skills, effort and responsibility." See Eggert, 94-BEM-1568.

## CONCLUSION

The Bank emphatically denies that it discriminated against Complainant on the basis of her age or sex. To the contrary, as is more fully explained above, Complainant has failed to establish the fourth prong of the applicable legal standard: that the Bank hired an individual not in her protected class with qualifications similar to her. Rather, the Bank selected the most qualified candidate for the position and the candidate was also a member of both of Complainant's protected classes: a woman over forty (40) years of age. Complainant was never the subject of any discriminatory treatment. Therefore, Complainant's claims of age and sex discrimination are without merit and should be dismissed.

The Bank also emphatically denies that it paid Complainant less than a male co-worker for substantially similar work. As is more fully explained above, the male co-worker had managerial responsibility when he was initially hired by the Bank and many years of experience as a retail manager – unlike Complainant. Therefore, Complainant's claim of unequal pay is without merit and should be dismissed.

For all of these reasons, the Bank respectfully requests that the MCAD dismiss the Charge for lack of probable cause to credit the allegations. Please feel free to contact either of us if you have any questions concerning this matter, or need any additional information to assist you in your investigation.

Very truly yours,

Sara Goldsmith Schwartz
Shelley A. Costantino

SAC:kd
Enclosures
cc:     Ms. Janice Marcella (w/ encl., by Certified Mail, Return Receipt Requested)
Position Statement

SCHWARTZ HANNUM PC

Ms. Maryann Brunton                              -19-                          July 24, 2002

I, Gail Hamel, Vice-President, Human Resources Representative, state that: I have read the foregoing position statement and know its contents; this position statement was prepared with the assistance and advice of counsel and current employees of Banknorth, upon whose advice and information I have relied; the information set forth herein, subject to inadvertent or undiscovered errors, is based upon and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of investigation to date; and, subject to the limitations set forth herein, this position statement is true to the best of my present recollection, knowledge, information, and belief.

Sworn to under the pains and penalties of perjury, this 23 day of July, 2002.

Gail Hamel

Massachusetts Superior Court

COMMONWEALTH v. ARON, REALTY, No. 004411 (July 30, 2001)

Commonwealth v. Douglas A. Aron, Trustee of

Kenwood Realty Trust et al. [fn1]

No. 004411

COMMONWEALTH OF MASSACHUSETTS SUPERIOR COURT.

Middlesex, SS

July 30, 2001

[fn1] Kenwood Organization, and Umberto Fabri.

CRATSLEY, J.

The Commonwealth of Massachusetts, through its Attorney General, brought this action for housing discrimination, pursuant to G.L.c. 151 B, § 4 (4), 4 (4A), 4 (7), and 4 (18), against Douglas Aron, trustee of Kenwood Realty Trust, Kenwood Organization, Inc., and Umberto Fabri ("Fabri"). Kenwood Organization Inc. now moves this court to dismiss the complaint against it for lack of subject matter jurisdiction. For the reasons set out below, the Kenwood's motion to dismiss is *DENIED*.

### BACKGROUND

The complaint alleges that Ms. Suzanne Robinson ("Robinson") was unlawfully discriminated against because she was subjected to sexual harassment by Fabri, the General Manager of Village on the Hill in Framingham, Massachusetts, where she lived. Village on the Hill is owned by Kenwood Realty Trust and managed by Kenwood Organization, Inc. Douglas Aron is both a trustee of Kenwood Realty Trust and the President of Kenwood Organization Inc. The complaint also alleges that Kenwood Organization Inc. and Kenwood Realty Trust were aware of the sexual harassment and failed to take appropriate corrective measures. In addition, the complaint alleges that when Robinson refused Fabri's sexual advances and reported them to Kenwood Realty Trust, she was retaliated against by the defendants who refused to make repairs on her apartment.

The complaint specifically alleges that from 1995 to 1999, Fabri made "numerous unwelcome and offensive, sexually explicit comments and jokes to Robinson" and pressured Robinson to have a sexual relationship with him. Complaint ¶ 15. The complaint cites various specific incidents. For example, in the spring of 1998, Fabri requested that Robinson meet him in a vacant apartment to discuss a complaint that a tenant had made against her. When Robinson refused, Fabri threatened to inspect her apartment, to which Fabri had keys. The two finally agreed to meet at a nearby playground where Fabri is alleged to have used unwelcome sexually explicit language. The complaint cites other incidents where Fabri made inappropriate sexual comments to Robinson.

In April of 1999, Robinson notified the management at Village On the Hill that a number of tiles in her shower had fallen off and needed immediate repair. Fabri and the maintenance manager, Charles Fritz, came

**EXHIBIT  B**

to inspect the shower and Fabri again is alleged to have made inappropriate sexual comments directed at Robinson. Although Fabri informed Robinson that someone would contact her to schedule the repair, she was never contacted. On June 8, 1999, Robinson wrote a letter to Kenwood Realty Trust informing it of Fabri's conduct and the fact that the repairs had not yet been conducted. Robinson received no response to her letter. Robinson then reported the damage in her bathroom to the Framingham Board of Health who inspected the apartment on June 30, 1999. On July 2, 1999, the Board of Health notified the defendants that Robinson's apartment was in violation of the sanitary code because, among other things, there was a hole in the shower wall. The defendants subsequently made the repairs to Robinson's apartment.

On July 9, 1999, Robinson filed a complaint against Fabri and Kenwood Realty Trust with the United States Department of Housing and Urban Development ("HUD") and with the Massachusetts Commission Against discrimination ("MCAD"). On July 19, 1999, Aron submitted a position statement written on Kenwood Organization, Inc. letterhead denying the allegations and stating that Fabri was a long-time employee of Kenwood Organization, Inc. He signed the statement as President of Kenwood Organization, Inc. On August 16, 2000, MCAD issued a finding of probable cause that the defendants unlawfully discriminated against Robinson because of her sex. On August 23, 2000, the defendants filed a notice of election to pursue a judicial determination of the matter under G.L.c. 151B, § 5. Pursuant to that statute, MCAD dismissed the matter and the Attorney General brought the present complaint charging unlawful sexual harassment, unlawful interference with housing, and unlawful retaliation and requesting declaratory and injunctive relief and damages.

The defendant, Kenwood Organization, Inc. now moves to dismiss the complaint for lack of subject matter jurisdiction claiming that Robinson's failure to name it as a defendant in the complaint she filed with MCAD bars this Superior Court action under G.L.c. 151B, § 5.

## DISCUSSION

Under Mass.R.Civ.P. 12 (b)(1) a court must dismiss an action over which it lacks subject matter jurisdiction. When a court is considering a motion made under Mass.R.Civ.P. 12 (b)(1), the court may consider materials beyond the scope of the pleadings. See Watros v. Greater Lynn, 421 Mass. 106, 108-08 (1995).

Before an action may be brought in Superior Court for a violation of c. 151B. a person must file a complaint with MCAD that identifies, among other things, the persons alleged to have committed the unlawful discriminatory act. See G.L.c. 151B, § 5. The purpose of this filing requirement is to provide the employer with notice of the claim and to give the agency an opportunity to investigate and conciliate the claim. See Carter v. Commissioner of Correction, 43 Mass. App. Ct. 212, 217 (1997). Failure to name a party in the MCAD complaint usually bars the plaintiff from later filing a Superior Court action against that party for violation of c. 151B. See Powers v. H.B. Smith Co., 42 Mass. App. Ct. 657, 667 (1997) (failure to name aparty in an MCAD complaint when the plaintiff knew of that party's involvement with the challenged action bars a subsequent court action against that party).

Federal courts have interpreted c. 151B to allow an action against a defendant who was not named as a respondent in the MCAD complaint if the complaint put the conduct of that defendant in issue and the defendant

had notice of the complaint and an opportunity to conciliate the charge.
See *Chatman v. Gentle Dental Center of Waltham*, 973 F. Supp. 228, 235
(D.Mass. 1997) (citing *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st
Cir. 1996); *Brunson v. Wall*, 405 Mass. 446 (1989). See also *Chapin v.
University of Massachusetts at Lowell*, 977 F. Supp. 72, 76 (D.Mass. 1997)
(recognizing the test set out in *Chatman v. Gentle Dental Center of
Waltham* and finding that an MCAD complaint alleging that "management and
other officials" were aware of the harassment was sufficient to put the
police chiefs conduct at issue and also finding that the chief had notice
of the complaint and an opportunity to conciliate the claim).

     The Massachusetts Court of Appeals in *King v. First*,
46 Mass. App. Ct. 372, 374 (1999), acknowledged that no Massachusetts
appellate decision has yet wrestled with the question whether the failure
to name a party in the complaint filed with the MCALD precludes a later
court action against the unnamed party without exception." The Appeals
Court in *King* assumed without deciding that the exceptions recognized by
the federal courts when analyzing claims filed with the Equal Opportunity
Employment Commission under Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-5(f)(1), applied for purposes of analyzing the
claim by *King*. *Id*. 374-75 (the factors used by the federal courts in
determining if an exception exists include: if the named party acted as
the unnamed party's agent and the unnamed party had notice of and
participated in the conciliation proceedings, if the unnamed party was
unknowable to the plaintiff, if the interests of the unnamed party are
similar to those of the named party, if the absence of the unnamed party
at the administrative proceedings would result in actual prejudice to the
unnamed party, and if the unnamed party represented to the plaintiff that
its relationship to the complaint was through the named party). The
appellate court in King found, however, that even if the exceptions
applied, they would not assist the plaintiff in maintaining his claim.
*Id*. At 375. Although it did not affirmatively recognize any of the
federal exceptions it discussed, the Appeals Court opinion did reiterate
the language from *Chatman v. Gentle Dental Center of Waltham* that the
purpose of the MCAD filing requirement is to provide notice to a defendant
and to give a defendant the opportunity to conciliate. *Id*. (citing *Carter
v. Commissioner of Correction*, 43 Mass. App. Ct. 212, 217 (1997)).

     Numerous Superior Court cases have analyzed the question of whether a
court action can be maintained against a party not named as a respondent
in the MCAD complaint using the test set out by *Chatman v. Gentle Dental
Center of Waltham*, supra, and *Carter v. Commissioner of Correction*,
supra, of whether the party's conduct was put at issue and whether the
party had notice and an opportunity to conciliate the claim. [fn2]

     Applying this test to the facts of the present case, the conduct of
Kenwood Organization, Inc. was put at issue, it did have notice of the
MCAD complaint, and it did have an opportunity to conciliate the
charges. See *Chatman v. Gentle Dental Center of Waltham*, supra; *Carter
v. Commissioner of Correction*, supra.

     The plaintiff filed a complaint with MCAD naming Kenwood Realty Trust,
Aron, and Fabri as respondents. The conduct of Kenwood Organization,
Inc. was not directly mentioned in the substance of the complaint.
Contrast *Avitable v. W.M. Gulliksen Manufacturing Co., Inc.*, No.
00-3522A, 12 Mass. L. Rptr. 653 (Suffolk, February 20, 2001) (finding
that a party who was specifically identified in the section of the MCAD
complaint that requires a description of the unlawful action placed that
party's conduct in issue and gave him notice and an opportunity to
conciliate the charges such that he could be named as a defendant in the

court action).

There is a strong relationship, however, between Kenwood Realty Trust, Aron, Fabri, and Kenwood Organization, Inc. which is sufficient to establish that the conduct of Kenwood Organization, Inc. was placed at issue in the complaint. The MCAD complaint states that Fabri retaliated against Robinson's resistance to his sexual advances by failing to make needed repairs in his position as manager of the building. The MCAD complaint also states that Robinson reported Fabri's conduct to the owner of the building, Kenwood Realty Trust. The MCAD complaint names Aron as a respondent in his capacity as trustee of Kenwood Realty Trust. Aron, however, also serves as president of Kenwood Organization. Inc. In this Court's opinion, the ties of Aron, Fabri, and Kenwood Realty Trust to Kenwood Organization, Inc. are sufficient such that the allegations in the complaint put the conduct of Kenwood Organization, Inc. in issue.

Further, the defendant, Kenwood Organization, Inc., had notice of the MCAD complaint against it and had an opportunity to conciliate. In fact, Aron filed a written response to the MCAD complaint on behalf of Kenwood Organization, Inc. defending Fabri's actions. The letter was signed by Aron as president of Kenwood Organization, Inc. and also signed by Fabri. "A direct denial of MCAD charges has been found to be an indication of notice and an opportunity to conciliate." *Mitchell v. New England Home for Little Wanderers, Inc.*, 10 Mass. L. Rptr. 252 (Suffolk, June 29, 1999) (citing *Chapin v. University of Massachusetts at Lowell*, 977 F. Supp. 72, 77-78 (D.Mass. 1997). Kenwood Organization, Inc., by its response to the MCAD complaint, has shown that it had notice of the claim and an opportunity to conciliate.

*ORDER*

For the reasons stated above, the defendant Kenwood Organization Inc.'s motion to dismiss is *DENIED*.

[fn2] See *Avitable v. W.M. Gulliksen Manufacturing Co., Inc.*, No. 00-3522A, 12 Mass. L. Rptr. 653 (Suffolk, February 20, 2001) (finding that a party who was specifically identified in the section of the MCAD complaint that requires a description of the unlawful action placed that party's conduct in issue and gave him notice and an opportunity to conciliate the charges such that he could be named as a defendant in the court action); *Mitchell v. New England Home for Little Wanderers, Inc.*, No. 98-4892A, 10 Mass. L. Rptr. 252 (Suffolk, June 29, 1999] (finding that two parties who were not mentioned anywhere in the MCAD complaint had no notice of the charges against them and therefore could not be named as defendants in the court action, and finding that the conduct of another party was put in issue in the complaint, but that the party received no notice of the complaint or opportunity to conciliate and therefore could not be named as a defendant); *Fuer v. Congregation of Sisters of St. Joseph of Boston. Inc.*, No. 96-6888 (Middlesex. March 19, 1999) (court action could be maintained because the conduct of an unnamed party was put in issue through the allegations in the MCAD complaint, that party had notice and an opportunity to participate in the conciliation proceedings. and that party's interests were similar to those of the named party) *LeCierc v. Interstate Distributors, Inc.*, No. 97-02008, 8 Mass. L. Rptr. 654 (Norfolk. February 11, 1998) (parties' conduct was placed in issue in MCAD complaint. it could be inferred from the fact that the parties investigated the complaint that they had notice, and it could also be inferred that they participated in the response to the complaint); *Kukeiz v. MDC Fitness Corp.*, No. 98-011 4A, 9 Mass. L. Rptr. 261 (Plymouth, August 10, 1998) (action could be maintained against a party

not named as a respondent in the MCAD complaint because her conduct was put at issue and she had notice and an opportunity to conciliate): *Riebold v. Eastern Casualty Insurance Co., Inc.*, No. 97-00306, 6 Mass. L. Rptr. 706 (Middlesex, June 4. 1997) (action could not be maintained against unnamed parties even though the identity and conduct of those parties was set out in the description section of the MCAD complaint form): *Albee v. New England Medical Center Hosptials. Inc.*, No. 96-1655-3, 7 Mass. L. Rptr. 593 (Middlesex, October 30, 1997) (finding that the complaint against a party whose conduct was put at issue, but who was not named as a respondent in the MCAD complaint could not be maintained, even though the plaintiff had moved to amend the MCAD complaint to add the unnamed party, because none of the federally recognized exceptions under Tile VII applied).

Copyright © 2002 Loislaw.com, Inc. All Rights Reserved